IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN NEW YORK
BUFFALO DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) CIVIL ACTION NO. 1:18-cv-00562 ) |
| v. | ) COMPLAINT ) |
| STAFFING SOLUTIONS OF WNY, INC. | ) JURY TRIAL DEMAND ) |
| Defendant. | ) ) |
| _____ | ) |

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII"); Titles I and V of the Americans with Disabilities Act of 1990 ("ADA"); the Age Discrimination in Employment Act ("ADEA"); and Title I of the Civil Rights Act of 1991, to correct a host of unlawful employment practices on the basis of race, sex, disability, age, and retaliation, and to provide appropriate relief to Charging Party Tammi Iser and aggrieved applicants and employees who were adversely affected by such practices.

As alleged with greater particularity below, Defendant, Staffing Solutions of WNY, Inc.—a staffing agency that hires and places employees with clients in Western New York— has violated and continues to violate Title VII by failing to hire Black applicants, or by failing to hire Black applicants for positions it deems "White," or by failing to hire Black applicants for certain clients who express a preference for White applicants. Defendant also hires men or women only for specific positions because of client requests or because Defendant determines those positions should go to one sex or another. Defendant thereby segregates its applicants and employees by sex and race.

Defendant also has violated and continues to violate Title VII by failing to hire applicants and terminating employees who have interracial romantic or social relationships.

Defendant also has violated and continues to violate Title VII by failing to hire pregnant applicants and by terminating employees who become pregnant. Defendant has violated and continues to violate the ADEA by failing to hire applicants age 50 or over.

Defendant also has violated and continues to violate the ADA by failing to hire and failing to accommodate applicants or former employees who are actually disabled or whom Defendant regarded as disabled, including applicants who have been injured, have cancer, have filed a workers' compensation claim, and who test positive for prescribed medications. Defendant further violates the ADA by subjecting applicants to medical inquiries (including questions about injuries and illnesses) and storing medical information on application materials and in non-medical employment and applicant files.

Defendant has violated and continues to violate Title VII, ADEA, and ADA record-keeping requirements by shredding or otherwise destroying application materials, often immediately after an applicant is rejected for discriminatory reasons, and by destroying records of rejected applicants after receiving Charging Party's charge of discrimination.

Finally, Defendant has violated and continues to violate Title VII, the ADEA, and the ADA by engaging in retaliation, including by constructively discharging Charging Party for opposing many of the practices described above, and by discharging other employees who complain about discrimination.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to: Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII"); Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; Section 7(b) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(b) (the "ADEA"), which incorporates by reference Sections 16(c) and Section 17 of the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. §§ 216(c) and 217; Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the District of Western New York.

## PARTIES

3.      Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, Title I of the ADA, and the ADEA.  The Commission is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1); by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3); and by Section 7(b) of the ADEA, 29 U.S.C. § 626(b), as amended by Section 2 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781, and by Public Law 98-532 (1984), 98 Stat. 2705.

4.      At all relevant times, Defendant, Staffing Solutions of WNY, Inc., a New York corporation, has continuously been doing business in the State of New York and the City of

Buffalo, and has continuously had at least 20 employees, which is sufficient for coverage under Title VII, the ADA and the ADEA.

5.      At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under: Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h); Sections 101(5) and 101(7) of the ADA, 42 U.S.C.§§ 12111(5) and (7); and Sections 11(b), (g) and (h) of the ADEA, 29 U.S.C. §§ 630(b), (g) and (h).

6.      At all relevant times, Defendant has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## ADMINISTRATIVE PROCEDURES

7.      More than thirty days prior to the institution of this lawsuit, Tammi Iser filed a charge with the Commission alleging violations of Title VII, the ADEA, and the ADA by Defendant.

8.      On November 7, 2017, the Commission issued to Defendant a Letter of Determination finding reasonable cause to believe that Title VII, the ADEA, and the ADA were violated with respect to Charging Party and other aggrieved individuals, and inviting Defendant to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

9.      The Commission engaged in communications with Defendant to provide Defendant the opportunity to remedy the discriminatory practices described in the Letter of Determination.

10.      The Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

11.      On December 4, 2017, the Commission issued to Defendant a Notice of Failure of Conciliation.

4

12.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

13.     Kathleen Faulhaber started Defendant in 2010 and has owned Defendant and served as its CEO since then.

14.      Defendant hires and places employees at clients in various, primarily unskilled, light industrial, clerical, and warehouse positions in Western New York.

15.     Defendant pays the wages, workers' compensation insurance costs, and unemployment insurance contributions for everyone it hires, and represents to applicants whom it hires that Defendant is their employer.

16.     Defendant often hires and places applicants months after they apply.

17.     Faulhaber and Defendant's recruiters and other office staff (collectively "recruiters"), screen and interview applicants at its Buffalo office.

18.     Charging Party served as Defendant's office manager from October 21, 2013 through September 16, 2015.

19.     Defendant describes applicants whom it does not hire and determines never to hire in the future as "closed," and follows certain procedures to ensure that "closed" applicants are not hired in the future, including the creation of red "closed" Microsoft Outlook records that inform Defendant's recruiters that applicants are not to be hired.

20.     Defendant does not tell rejected and "closed" applicants that they have been rejected and closed. Instead, Defendant generally tells such applicants, both initially and if they subsequently follow up with Defendant, that there are no available placements but that Defendant will contact them if a placement becomes available.

## **TITLE VII CLAIMS**

### RACE

21.      Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by failing to hire Black applicants at all or for placements with certain clients and in particular positions. For example:

     a.    Faulhaber refers to Black applicants and/or Black people generally using the word "nigger" and has characterized certain White people as "nigger lovers."

     b.    Faulhaber rejects and closes Blacks applicants and instructs recruiters to do so even when recruiters deem Black applicants qualified and want to hire them. On occasions, Faulhaber has explicitly stated that she is doing so because the applicants are Black.

     c.    For example, on one occasion, Faulhaber instructed a recruiter not to hire a candidate because he was a "big Black guy." On another occasion Faulhaber instructed a recruiter not to hire an applicant because he was a "big Black nigger."

     d.    And on another occasion, Faulhaber explicitly rejected an applicant because he was Black and had dreadlocks.

     e.    Defendant conducts shorter interviews of some Black applicants because they are going to be immediately rejected and closed.

     f.    Black applicants who are qualified and have work experience relevant to the jobs Defendant posts or is hiring for are rejected and closed.

     g.    For example, Defendant rejected an applicant seeking office or customer

service work who had experience as a sales associate, a collections agent, a lottery agent, in bank and pharmacy customer service, and in check cashing. This applicant's interview was short and Defendant told her there was nothing available for her, both at her interview and when she called regularly for months afterwards.

h.      As another example, an applicant applied in response to Defendant's online posting for nursing-home work. This applicant had worked in nursing homes previously, but was repeatedly told that Defendant did not have an available placement for her.

i.      For those Black applicants who are hired, Defendant ensures that they are placed with certain clients and not others.

j.      Defendant generally does not hire Black applicants for positions with clients in primarily White suburban areas, which often pay more than other placements. Instead, Black applicants are sent to placements in predominantly Black neighborhoods and/or that entail work deemed by Faulhaber to be "dirty" or "grungy."

k.      Defendant also follows the discriminatory requests of clients who have communicated their preference for White applicants.

l.      For example, a manager at one client told Defendant that he didn't want any applicants who were Black. Faulhaber instructed Defendant's recruiters to give that manager what he wanted.

m.      As another example, Faulhaber forbade a recruiter from hiring a Black applicant who was working with a client for an additional shift because Faulhaber contended the manager of that shift did not want Black workers.

7

n.      In order to facilitate these discriminatory hiring practices, Defendant often

reviews the documents applicants submit for supposed indicia of race such

as hair and eye color, or inspects driver's license photographs to determine

race.

o.      Defendant sometimes refers to Black applicants as "Bs" and White

applicants as "Ws."

22.     Since at least January 1, 2014, Defendant has engaged in unlawful employment

practices at its Buffalo office and throughout Western New York, in violation of

Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), by segregating Black applicants and

employees. These unlawful practices include, but are not limited to, the allegations set forth in

paragraph 21, particularly paragraphs 21(i)-(o), above.

23.     Since at least January 1, 2014, Defendant has engaged in unlawful employment

practices at its Buffalo office and throughout Western New York, in violation of Section

703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by failing to hire applicants because of their

association with individuals of another race. For example, Faulhaber calls White female

applicants who come to Defendant's office with Black boyfriends "nigger lovers" and then

rejects and closes their applications.

24.     Since at least December 6, 2014, Defendant has engaged in unlawful employment

practices at its Buffalo office and throughout Western New York, in violation of Section 703

(a)(1) of Title VII, 42 U.S.C. §2000e-2(a)(1), by terminating employees because of their

association with individuals of another race, specifically by terminating the employment of

White employees for their associations with Black individuals. For example, when Faulhaber

learned that a White employee was dating a Black man, Faulhaber called that employee "a nigger

lover" and shortly thereafter terminated her employment and closed her application.

<u>SEX</u>

25.     Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by engaging in sex-based hiring, including failing to hire both male and female applicants depending on the client or position. Specifically, Defendant determined that some placements or job types should solely or primarily go to applicants of one sex or another.

>  a.     For example, Defendant almost exclusively hired men for a client trucking firm whose work involved loading and unloading.  This trucking firm was deemed a "male assignment" and men were almost exclusively assigned— women had to be "manly" looking to merit placement there.

>  b.     Female applicants are primarily hired for placements with particular clients and for receptionist and clerical positions generally.

>  c.     Defendant also complies with clients' requests for male or female workers only.

>  d.     Defendant and some of its clients refer to females as "lights" and males as "heavies."

>  e.     These clients repeatedly request a certain number of "heavies" and "lights" for certain shifts and days, and Defendant agrees to, and provides, the requested number of male and female workers.

26.     Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 703 (a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), by segregating male and female applicants and employees. These unlawful practices include, but are not limited to, the allegations set forth in

paragraph 25 above.

SEX/PREGNANCY

27.     Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Sections 701(k) and 703(a)(1) of Title VII, 42 U.S.C. §§ 2000e(k) and 2000e-2(a)(1), by failing to hire pregnant applicants.  For example:

    a.     Defendant rejects and closes applicants who are visibly pregnant or disclose their pregnancy, particularly applicants who are further along in their pregnancy.

    b.     During Charging Party's employment, Defendant sometimes rejected and closed two-to-three applicants per month because they were pregnant.

    c.     Defendant regularly asks pregnant applicants how much longer before they give birth.

    d.     Faulhaber also has expressed concerns about costs and liabilities associated with pregnant employees.

28.     Since at least December 6, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Sections 701(k) and 703(a)(1) of Title VII, 42 U.S.C. §§ 2000e(k) and 2000e-2(a)(1), by terminating the employment of pregnant employees.  For example, after Faulhaber learned that an employee Defendant had placed with a client was pregnant, Faulhaber called the employee, told her the assignment with the client had ended for misconduct that the employee had not in fact committed, and reprimanded her for not disclosing her pregnancy. Defendant never hired this employee again.

29.     The effect of the practices complained of in paragraphs 21-24 above has been to deprive applicants and employees of equal employment opportunities and otherwise adversely affect their status as employees and applicants for employment because of their race.

30.     The effect of the practices complained of in paragraphs 25-26 above has been to deprive female and male employees and applicants for employment of equal employment opportunities and otherwise adversely affect their status as employees and applicants for employment because of their sex.

31.     The effect of the practices complained of in paragraphs 27-28 above has been to deprive pregnant employees and applicants for employment of equal employment opportunities and otherwise adversely affect their status as employees and applicants for employment because of their sex.

32.     The unlawful employment practices complained of in paragraphs 21-28 above were and are intentional.

33.     The unlawful employment practices complained of in paragraphs 21-28 above were and are done with malice or with reckless indifference to the federally protected rights of Black, female (including pregnant), and male employees and applicants; and those employees and applicants who associate with individuals of a different race.

## ADEA CLAIMS

34.     Since at least January 1, 2013, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), by failing to hire applicants age 50 or over.  For example:

    a.      Faulhaber regularly instructs Defendant's recruiters to reject and close older applicants, particularly applicants age 50 or over, even when recruiters deem the applicants qualified and want to hire them.

b.   Faulhaber herself regularly rejects and closes applicants age 50 or over herself, and has stated things like she was rejecting this "old man" or has otherwise indicated that she was rejecting and closing an applicant because of age.

c.   Defendant solicits and otherwise attempts to ascertain applicants' dates of birth, including by asking for dates of birth on an emergency contact form given to applicants, and records applicants' dates of birth provided during interviews.

d.   Defendant fails to hire and closes numerous applicants over the age of 50 who are qualified and have work experience relevant to the jobs Defendant posts or for which Defendant is otherwise hiring.

e.   For example, Defendant rejected an applicant born in 1960 who had experience in bookkeeping, light industrial work, and general labor. Defendant created a closed Outlook file for this applicant, ensuring that he would never be hired. This applicant called Defendant repeatedly but was told there was nothing available.

f.   As another example, Defendant did not hire an applicant born in 1962 who had experience in clerical, computer, and office work, and who applied in response to Defendant's advertisement for clerical work. Defendant created a closed Outlook file for this applicant, ensuring that she would never be hired.

g.   As another example, Defendant rejected an applicant born in 1945 who had extensive experience in welding, material handling, shop work, and bridge and rail construction. Defendant created a closed Outlook file for

this applicant, ensuring that he would never be hired.  This applicant

called Defendant multiple times seeking work, but Defendant always told

him that there was nothing available.

35.     The effect of the practices complained of in paragraph 34 above has been to

deprive applicants age 50 or older of equal employment opportunities and otherwise adversely

affect their status as applicants for employment because of their age.

36.     The unlawful employment practices complained of in paragraph 34 above were

and are willful within the meaning of Section 7(b) of the ADEA, 29 U.S.C. § 626(b).

## ADA CLAIMS

37.     Since at least January 1, 2014, Defendant has engaged in unlawful employment

practices at its Buffalo office and throughout Western New York, in violation of Sections 102(a)

and (b) of Title I of the ADA, 42 U.S.C. §§ 12112 (a) and (b), by failing to hire qualified

individuals with a disability.  Numerous applicants whom Defendant fails to hire are qualified

individuals with a disability under Sections 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and

12111(8). Defendant regards these applicants as having a disability by failing to hire them

because of actual or perceived impairments, and/or these applicants have actual impairments that

substantially limit major life activities but could perform the essential functions of the jobs with

Defendant's clients with reasonable accommodation:

a.   In many instances, Defendant learns of actual or perceived impairments

because it asks applicants—well before an offer of employment is made—

probing questions about current or past impairments, injuries, physical or

medical conditions, and workers' compensation claims.  The standard

form Defendant's recruiters use to interview applicants contains the

question: "Do you have any previous injuries or work related accidents?"

13

b.    Defendant generally does not hire, and closes, applicants who reveal an impairment, a medical or physical condition, an injury, or a workers' compensation claim during the application process.

c.    Defendant rejects and closes these applicants without making any determination as to whether they can perform, with or without reasonable accommodation, the essential functions of the jobs for which Defendant is or will be hiring.

d.    For example, in response to Defendant's questioning, an applicant disclosed her throat cancer, said that the cancer began six years before, but told Defendant that she was not receiving treatment, did not need any accommodation, and could perform any job. Defendant noted her throat cancer and its duration on Defendant's interview form. Defendant refused to hire and closed this applicant, but told her only that no position was available. Defendant told her the same thing when she repeatedly followed up seeking work.

e.    As another example, a blind applicant applied in 2015 with the assistance of a sighted person who accompanied him. Defendant immediately closed his application and shredded his application materials after he left the office. Defendant made no effort to determine whether the assistance of this sighted person or a sighted coworker, or any other accommodation, would allow this applicant to perform the essential functions of placements with Respondent's clients.

f.    As another example, in response to Defendant's questioning, an applicant revealed a previously broken tibia and fibia that required bi-monthly

medical appointments. Defendant noted this applicant's injury and required medical appointments on his interview form. The applicant was not hired and was closed. Defendant made no effort to determine whether there were placements where this applicant's work schedule would allow him to attend his medical appointments.

g.      As another example, Defendant rejected an applicant and created a closed Outlook file for the applicant noting that he had a back impairment and couldn't stand for an entire shift. Defendant made no effort to determine whether there were placements where this applicant's standing limitation could be accommodated.

h.      Defendant also often closes and refuses to hire applicants whom it initially hired and placed; who then suffer or reveal an impairment, a medical or physical condition, an injury, or a workers' compensation claim; and who then seek to be hired for another placement.

i.      For example, Defendant hired an applicant who, after he started his job, revealed to Defendant that he had an enlarged heart but needed only two days off and could then work without restriction. Defendant closed and refused to hire this applicant for another placement, even when he reapplied more than a year later.

j.      Many of these rejected applicants have extensive relevant experience. For example, the applicant rejected for throat cancer had experience in customer service and housekeeping; and the applicant rejected because of his previously broken tibia and fibia had experience performing carpentry work and general labor.

      k.      Until early 2015, Defendant regularly conducted drug tests of all applicants as soon as they walked into Defendant's office or while they were being interviewed.  And since early 2015, Defendant continues to conduct drug tests for applicants it may place with certain clients.

      l.      Defendant rejects and closes nearly all applicants who test positive for any substance, even when the applicant indicates the substance is prescribed or produces a prescription.

      m.      For example, Defendant did not hire one applicant even though he explained that his positive test for amphetamines was caused by his prescribed Adderall, which had been prescribed for his anxiety and/or bipolar disorder.

38.      Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Sections 102(a) and (b)(5)(A) and (B) of Title I of the ADA, 42 U.S.C.§§ 12112(a) and (b)(5)(A) and (B), by failing to provide reasonable accommodations to the disabilities of applicants and/or failing to hire applicants because of the need to make reasonable accommodations to their impairments. As described in paragraphs 37 above, numerous applicants whom Defendant fails to hire are qualified individuals with a disability under Sections 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8), because these applicants have impairments that substantially limit major life activities. For example:

      a.      As described in paragraph 37 above, numerous applicants reveal impairments that substantially limit a major life activity and a need for accommodation.

      b.  As described in paragraph 37 above, particularly subparagraphs (c) and (e)-(h), Defendant makes no effort to accommodate these applicants, either by talking with its clients to see if accommodations can be provided, or in any other way.  Instead, Defendant fails to provide the reasonable accommodation requested or any other accommodation, and fails to hire and closes these applicants.

39.    Since at least January 1, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 102(b)(6) of Title I of the ADA, 42 U.S.C.§§ 12112 (b)(6), by using a qualification standard that screens out or to tends to screen out a class of individuals with a disability. These unlawful practices include, but are not limited to, Defendant's practice of rejecting applicants who test positive for any substance for which Defendant tests even where the positive test is the result of prescribed medication, as described in paragraph 37, particularly paragraphs 37 (k)-(m), above.

40.    Since at least December 6, 2014, Defendant has engaged in unlawful employment practices at its Buffalo office and throughout Western New York, in violation of Section 102(d) of Title I of the ADA, 42 U.S.C.§§ 12112(d) by making pre-offer medical and disability-related inquiries to applicants. These unlawful practices include, but are not limited to:

      a.  As described in paragraph 37 above, particularly paragraphs subparagraphs (a)-(d) and (f)-(g), before an offer of employment has been made, Defendant solicits extensive information that is likely to reveal information about disabilities, including asking applicants probing questions about current or past impairments, injuries, physical or medical conditions, and workers' compensation claims.

b.  As discussed in in paragraph 37 above, particularly subparagraphs (a)-(d)
and (f)-(g), Defendant rejects applicants based on their responses to these
inquiries.

41.      Since at least January 1, 2014, Defendant has engaged in unlawful employment
practices at its Buffalo office and throughout Western New York, in violation of Section 102(d)
of Title I of the ADA, 42 U.S.C.§ 12112(d), by failing to keep medical and disability-related
information in separate files and on separate forms.  Defendant routinely places doctor's notes,
workers' compensation records, and other disability-related documents and information in
employees' personnel files, in applicant folders, and/or on applicants' interview and other
application forms, including as described in paragraphs in paragraph 37, particularly paragraphs
37(d) and (f)-(g), above.

42.      The effect of the practices complained of in paragraphs 37-41 above has been to
deprive applicants for employment, employees, and former employees of equal employment
opportunities and otherwise adversely affect their status as applicants for employment,
employees, and former employees because of disability, medical and disability-related inquiries,
and/or Defendant's failure to keep medical and disability-related information  in separate files
and on separate forms.

43.      The unlawful employment practices complained of in paragraphs 37-41 above
were and are intentional.

44.      The unlawful employment practices complained of in paragraphs 37-41 above
were and are done with malice or with reckless indifference to the federally protected rights of
Defendant's applicants, employees, and former employees.

## TITLE VII, ADA, AND ADEA CLAIMS

### RETALIATION

45.     Since at least December 6, 2014, Defendant has engaged in unlawful discriminatory practices at its Buffalo office and throughout Western New York, in violation of Section 4(d) of the ADEA, 29 U.S.C. § 623(d); Section 503(a) of the ADA, 42 U.S.C. § 12203(a); and Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), by constructively discharging Charging Party's employment in retaliation for her opposition to the unlawful practices described above, and also by discharging other employees who complain about discrimination. These retaliatory unlawful practices include, but are not limited to:

a.      Charging Party repeatedly told Faulhaber that Defendant could not reject and close an applicant, or terminate an employee, on the basis of race, sex, age, or disability.

b.      For example, Charging Party responded to Faulhaber's instructions not to send Black candidates to a specific client by saying that Defendant should send the best qualified candidates.

c.      As another example, Charging Party told Faulhaber that Faulhaber was wrong to say Defendant should not hire a candidate because he was Black.

d.      Charging Party also objected to Faulhaber's discriminatory hiring and discriminatory hiring instructions by telling Faulhaber that her instructions and Defendant's practices were illegal, and that Charging Party didn't want to work for a company that discriminated.

e.      Charging Party repeatedly told Faulhaber that her destruction of personnel files and application materials was illegal, and that these documents had to be preserved.

f.     Charging Party made similar complaints about discriminatory hiring to
       Faulhaber's father, who is a part-owner of Defendant.

g.     When Charging Party disagreed with Faulhaber about a discriminatory
       hiring decision or voiced her objections to Defendant's discriminatory
       practices, Faulhaber told her to "shut up" and/or told her that if Charging
       Party didn't want to do her job, Faulhaber would find someone else who
       would.

h.     Faulhaber also repeatedly emphasized that she was Defendant's owner and
       therefore Charging Party would have to abide by Faulhaber's rules or be
       fired.

i.     Faulhaber responded to Charging Party's expressed reluctance to reject
       and close an applicant for discriminatory reasons by saying that Charging
       Party had to reject and close the applicant because Faulhaber said so.

j.      Charging Party observed that Faulhaber's discrimination and
       discriminatory directives worsened over time.  As a result, Charging
       Party's expressions of opposition to discrimination, and Faulhaber's
       termination threats in response, grew more frequent. By the end of
       Charging Party's employment these exchanges were happening at least
       once a week.

k.     Shortly before the end of Charging Party's employment, she and
       Faulhaber had a particularly pointed confrontation about Faulhaber's
       treatment of Black applicants.  A Black applicant drove up to Defendant's
       office playing loud music from his car stereo.  Faulhaber loudly stated that
       that was why "they" were called "niggers", because that was how "they"

act. Charging Party told Faulhaber that she should not use that racist language or treat people that way, and that Black applicants in the waiting area could hear her. Faulhaber responded that it was Faulhaber's office and she would do what she wanted.  Faulhaber then repeatedly used the word "nigger" in confronting the Black applicant who had been playing the music, including by using the term "nigger music."

l.      On September 16, 2015, Charging Party, faced with the prospect of being forced to participate in discrimination prohibited by Title VII, the ADEA, and the ADA, or being terminated if she refused to comply, was compelled to leave her employment with Defendant and was thereby constructively discharged.

m.      Defendant also terminates and fails to rehire other employees who oppose discrimination at placements.  For example, Faulhaber terminated and closed two Black employees soon after she found out they had complained that they had been harassed and subjected to other discrimination at a placement because they were Black.

n.      Faulhaber informed one of those employees that he was being terminated because he had been absent for one day without notice, but the employee had been told that he was not to work that day.

46.     The effect of the practices complained of in paragraph 45 above has been to deprive Charging Party and other employees of equal employment opportunities and otherwise adversely affect their status as employees because of their protected activity

47.     The unlawful employment practices complained of in paragraph 45 above were and are intentional.

48.     The unlawful employment practices complained of in paragraph 45 above were are done with malice or with reckless indifference to the federally protected rights of Charging Party and other employees.

49.     The unlawful employment practices complained of in paragraph 45 above were and are willful within the meaning of Section 7(b) of the ADEA, 29 U.S.C. § 626(b).

RECORDKEEPING

50.     Since at least January 1, 2013, Defendant has failed, in violation of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), and in violation of Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), to make and preserve records relevant to the determination of whether unlawful employment practices have been or are being committed.  For example:

   a.     Defendant discards or destroys application materials for applicants Defendant fails to hire and closes—often immediately after the applicant applies and is rejected, and sometimes in larger purges that result in the destruction of the application materials well before a year has elapsed since Defendant received or created them.

   b.     Defendant also destroys the application materials and employment records for employees whom it hires but then terminates and closes.

   c.     Defendant has deleted relevant records, including closed Outlook files, after being served with Charging Party's charge of discrimination.

51.     Since at least January 1, 2013, Defendant has violated Section 7(a) of the ADEA, 29 U.S.C. § 626(a), by failing to make and preserve records required by the Commission necessary to the Commission's administration of the ADEA.  These unlawful practices include, but are not limited to, the allegations set forth in paragraph 50 above.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from discriminating against applicants, employees, or former employees on the basis of race, sex (including pregnancy), age, or disability and from engaging in any employment practice that discriminates on those bases.

B.      Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from retaliating against applicants, employees, or former employees who engage in protected activity, and from engaging in any employment practice that retaliates.

C.      Order Defendant to institute and carry out policies, practices, and programs that provide equal employment opportunities for all applicants, employees, and former employees, and that eradicate the effects of Defendant's past and present unlawful employment practices.

D.      Order Defendant to make and preserve all records: (1) relevant to the determination of whether unlawful employment practices have been or are being committed, in accordance with Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), and in accordance with Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c); and (2) required by the Commission pursuant to Section 7(a) of the ADEA, 29 U.S.C. § 626(a).

E.      Order Defendant not to make pre-offer medical or disability-related inquiries.

F.      Order Defendant to keep medical and disability-related information and documents separate, and not to commingle such information and documents with other documents and information in personnel and applicant files.

G.      Order Defendant to make whole Charging Party and the aggrieved individuals described in paragraphs 21-28, 37-41, and 45, including but not limited to: (1) Black applicants and employees; (2) female applicants and employees (including pregnant applicants and employees); (3) male applicants and employees; (4) applicants and employees who associate with individuals of another race; (5) employees who oppose discrimination; (6) applicants (including former employees) with a disability; (7) applicants who are not hired because they test positive for prescribed substances; (8) applicants subject to pre-offer medical or disability-related inquiries; and (9) applicants and employees whose medical and disability-related records and information are mixed in with personnel and applicant files, by providing appropriate relief including backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to instatement, reinstatement, or frontpay in lieu thereof.

H.      Order Defendant to make whole Charging Party and the aggrieved individuals described in paragraphs 21-28, 37-41, and 45 above by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 21-33 and 37-49 above, including but not limited to, job search expenses and medical expenses, in amounts to be determined at trial.

I.      Order Defendant to make whole Charging Party and the aggrieved individuals described in paragraphs 21-28, 37-41, and 45 above by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices described in paragraphs 21-33 and 37-49 above, including but not limited to, emotional pain, suffering, humiliation, and inconvenience, in amounts to be determined at trial.

J.      Order Defendant to pay Charging Party and the aggrieved individuals described in paragraphs 21-28, 37-41, and 45 above punitive damages for its malicious and reckless conduct, as described in paragraphs 21-33 and 37-49 above, in amounts to be determined at trial.

K.      Grant a judgment requiring Defendant to pay appropriate back wages in an amount to be determined at trial, an equal sum as liquidated damages, and prejudgment interest to individuals whose wages are being unlawfully withheld as a result of the age-based discriminatory hiring or the retaliatory constructive discharge complained of above, including but not limited to Charging Party, the individuals described in paragraphs 34 and 45 above,  and all individuals age 50 or over whom Defendant fails to hire because of age.

L.      Order Defendant to make whole Charging Party and all individuals adversely affected by the unlawful practices described in paragraphs 34-36 and 45-49 above, by providing the affirmative relief necessary to eradicate the effects of its unlawful practices, including but not limited to instatement, reinstatement, or frontpay in lieu thereof.

M.      Grant such further relief as the Court deems necessary and proper in the public interest.

N.      Award the Commission its costs of this action.

<u>JURY TRIAL DEMAND</u>

The Commission requests a jury trial on all questions of fact raised by its complaint.

Dated:  May 17, 2018

JAMES L. LEE
Deputy General Counsel

GWENDOLYN YOUNG REAMS
Associate General Counsel

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 M Street, N.E.

Washington D.C. 20507


JEFFREY BURSTEIN
Regional Attorney
jeffrey.burstein@eeoc.gov

NORA E. CURTIN
Supervisory Trial Attorney
nora.curtin@eeoc.gov

  /s/ Daniel Seltzer
Daniel Seltzer
Trial Attorney
Equal Employment Opportunity
Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Tel: 212-336-3701
Fax: 212-336-3623
Email: daniel.seltzer@eeoc.gov